# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GEORGE LYLE, | ) |
|       Plaintiff, | ) Civil Action No. 11-1474 |
| v. | ) Judge Arthur J. Schwab |
| MICHAEL J. ASTRUE, | ) Magistrate Judge Maureen P. Kelly |
| *Commissioner of Social Security*, | ) Re: ECF Nos. 10 and 12 |
|       Defendant. | ) |

## REPORT AND RECOMMENDATION

### I. RECOMMENDATION

It is respectfully recommended that the Court grant Plaintiff's Motion for Summary Judgment (ECF No. 10), deny Defendant's Motion for Summary Judgment (ECF No. 12), and reverse the decision of the administrative law judge ("ALJ").

### II. REPORT

**A. BACKGROUND**

**1. General**

George Lyle ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f ("Act"). Plaintiff filed for benefits claiming an inability to

work due to disability beginning May 1, 2009. (R. at 101 – 10).[1] Plaintiff's alleged disabling impairments initially included occipital neuralgia, chronic gout, nerve damage, and high blood pressure. (R. at 131). Chronic migraine pain was also later alleged beginning in early 2010. (R. at 153 – 62, 177 – 84). On June 23, 2011, the ALJ ruled that Plaintiff was not disabled under the Act and, as such, not entitled to benefits. (R. at 10 – 23). Having exhausted all administrative remedies, this matter now comes before the Court on cross motions for summary judgment. (ECF Nos. 10, 12).

Plaintiff was born on December 17, 1967, and was forty three years of age at the time of his administrative hearing. (R. at 28). Plaintiff lived with his wife and in-laws. (R. at 33). Plaintiff completed two years of college, but did not obtain a degree. (R. at 28). Plaintiff's most recent work included employment as an automotive detail manager between 2007 and 2009. (R. at 139). In 2010, Plaintiff allegedly attempted to obtain work as a collections supervisor for a bank, and as security personnel for a mall. (R. at 29). He claimed to have lost both positions because of frequent absence due to headache pain. (R. at 29). Plaintiff thereafter subsisted on his wife's income, and received healthcare through his wife's employer. (R. at 33).

**2. Treatment History[2]**

Plaintiff began to experience severe headache pain in July 2009. (R. at 30). Plaintiff was treated by Abdul Khan, M.D. – his internal medicine/ primary care physician. Plaintiff was admitted to the hospital on two occasions from March 16, 2010 until March 18, 2010, and March 20, 2010 until March 22, 2010, due to complaints of severe, recurrent headaches. Extensive diagnostic imaging studies, including MRI and CT scans of the brain, head, and cervical spine, a

---

[1] Citations to ECF Nos. 6 – 6-10, the Record, *hereinafter*, "R. at __."

[2] Plaintiff's arguments in his Motion are limited to the effects of headache pain on his ability to work. The court, therefore, will not discuss the record to the extent it pertains to other impairments which may have affected Plaintiff's alleged disability. (ECF No. 11 at 4 – 7).

cerebrospinal fluid tap, electrocardiogram, and blood work, did not reveal abnormalities to which Plaintiff's headache pain could be attributed. (R. at 197 – 99, 223 – 30). Following Plaintiff's inpatient hospitalizations, Plaintiff was provided with prescription medication and discharged with instructions to seek evaluation by a cervical spine specialist and pain specialist. (R. at 205 – 06, 232 – 33).

Following the March 2010 hospitalizations, Dr. Khan continued to treat Plaintiff for the migraine headache pain. On April 24, 2010, Dr. Khan completed an assessment of Plaintiff's functional capacity. He noted that his history with Plaintiff included treatment for rectal bleeding, hypertension, migraine headache, and cervical spine surgery. Dr. Khan opined that Plaintiff had normal muscle tone, normal reflexes, normal grip strength, full ability to perform fine and dexterous movements, normal station and gait, normal mobility, and no limitation in his ability to lift, carry, sit, walk, stand, push, or pull during the work day. Plaintiff had no postural or environmental limitations stemming from his physical condition, at that time. Dr. Khan's prognosis was "fair," and he felt that Plaintiff had the ability to manage his own benefits. (R. at 189 – 94).

Plaintiff was seen again at Dr. Khan's practice on June 4, 2010 by Cynthia Black, C.R.N.P., and complained that he continued to experience headache pain without relief. Upon examination, he was found to be in acute distress. Plaintiff was prescribed different medication for treatment of his headaches, and was advised to visit a pain treatment clinic. He was directed to return to Dr. Khan's office for possible adjustment of his medications. (R. at 299).

On June 25, 2010, Plaintiff was examined by Kerri Hromanik, C.R.N.P. at Dr. Khan's practice. She diagnosed Plaintiff with continuing chronic headaches, occipital neuralgia, and hypertension. Hromanik completed a Medical Source Statement of Claimant's Ability to

3

Perform Work-Related Physical Activities. She noted that Plaintiff had been experiencing severe headaches, chronic nature, associated with photophobia, general head pain, and neck pain with tightness. Plaintiff was prescribed pain medication which had not provided relief. He was referred back to the UPMC Pain Medicine Clinic and directed to follow up with a neurologist. In her assessment, Hromanik found Plaintiff to have marked limitations with activities of daily living and maintaining social functioning, and deficiencies of concentration, persistence, and pace. Hromanik considered Plaintiff to have no capacity to work, and no ability to drive. (R. at 236 – 39, 297 – 98). Dr. Khan signed off on this opinion and evaluation. (R. at 298).

Plaintiff did follow up with his referral to the UPMC Pain Medicine Clinic, as directed. He was evaluated at the clinic on April 21, 2010 and June 29, 2010. He was diagnosed with chronic headache and myofascial pain. (R. at 257, 302).

Plaintiff was evaluated by Neil A. Busis, M.D., a neurologist at the Pittsburgh Neurology Center on November 29, 2010. Dr. Busis noted that Plaintiff complained of continuous headache pain since early 2010. Plaintiff was on a number of prescription medications for treatment, but was unable to maintain a job as a result of his headache pain. Upon examination, Plaintiff had tenderness over the entire scalp, but he was otherwise alert and oriented, had normal speech, vision, memory, hearing, movement of his extremities, and reflexes. Dr. Busis increased the dosage of one of Plaintiff's prescriptions for migraine pain, and scheduled a follow-up appointment to assess the need for further diagnostic studies. (R. at 314 – 15).

On December 9, 2010, Plaintiff was again examined at Dr. Khan's office due to complaints of severe radiating headache and multiple near fainting episodes. (R. at 242 – 43, 291 – 92). As a result of his worsening condition, he was admitted to the hospital for further inpatient evaluation and treatment. Additional diagnostic imaging and neurological

consultations were performed. (R. at 242 – 43, 274, 277). Plaintiff experienced nausea and vomiting while in the hospital. (R. at 242 – 43). It was believed that a recent increase in prescription medication for treatment of Plaintiff's headache pain had actually made the pain worse. (R. at 244). During his five day hospitalization, Cheryl Bernstein, M.D., a neurologist with the UPMC Pain Medicine Clinic, diagnosed Plaintiff with a chronic headache with myofascial pain. She recommended the prescription of pain medication and for Plaintiff to be followed by Dr. Khan. (R. at 248 – 49).

On December 9, 2010, Nurse Practitioner Hromanik of Dr. Khan's office reported that Plaintiff's condition was "getting progressively worse and he is unable to work," and that he "is to be off work indefinitely." (R. at 240).

Plaintiff continued to be treated by Dr. Khan in 2011. He was seen by Dr. Khan on January 20, 2011. At that time, Plaintiff complained of continuous headaches. He explained that he could never get full relief from his pain, and took oxycodone to help him sleep. Plaintiff stated that he did occasionally experience some light sensitivity as a result of his headache pain. Dr. Khan adjusted Plaintiff's medications, and advised him to follow up with the headache clinic. (R. at 285 – 86). Plaintiff was not able to get an appointment date until May 2011. (R. at 285, 293).

In March 2011, Dr. Khan again examined Plaintiff relative to the continued complaints of headache pain. (R. at 283). He adjusted the prescribed medication for treatment. (R. at 283). Dr. Khan did not refill Plaintiff's one narcotic pain medication because such medication was not meant for treatment of migraines and often caused rebound headaches in migraine patients. Dr. Khan referred Plaintiff to another neurologist. (R. at 284).

Due to Plaintiff's ongoing chronic headache pain, he was again seen by Dr. Khan in his office on April 20, 2011. Dr. Khan provided medication and referred Plaintiff for a sleep study. (R. at 282).

On May 12, 2011, neurologist Robert G. Kaniecki, M.D. at the UPMC Headache Center evaluated Plaintiff for treatment of severe migraine headaches. Dr. Kaniecki diagnosed Plaintiff with chronic migraines, depressive disorder, anxiety, and insomnia. He recommended a change to four other prescription medications and made recommendations to try to control the headaches. Following the visit, Dr. Kaniecki authored a two sentence letter addressed "to whom it may concern." He expected Plaintiff to be "temporarily disabled as we adjust his treatment program." (R. at 308).

On June 20, 2011, Dr. Khan completed a Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities. (R. at 303 – 06). He noted that Plaintiff had a history of chronic headache/ migraine pain of unknown etiology. (R. at 303 – 06). As a result of this chronic headache pain, Dr. Khan felt that Plaintiff had no capacity to work. (R. at 303 – 06). In his opinion, Plaintiff's pain could be severe to extreme in nature, and he would experience fatigue requiring rest periods throughout the day. (R. at 303 – 06). Plaintiff would experience significant deficiencies in concentration, persistence, or pace which would result in frequent failure to complete tasks in a timely manner. (R. at 303 – 06)

B. ANALYSIS

### 1. Standard of Review

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[3], 1383(c)(3)[4]; *Schaudeck v.*

---

[3]   Section 405(g) provides in pertinent part:

>   Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[4]   Section 1383(c)(3) provides in pertinent part:

7

*Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based, and the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery,* 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 91 (3d. Cir. 1986).

---

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

## 2. Discussion

The ALJ determined that Plaintiff suffered a combination of medically determinable severe impairments: "history of cervical spine surgery, occipital neuralgia, chronic migraine without aura, with intractable migraine, so stated, without mention of status migrainosus, gout, chronic pain syndrome, hypertension, obesity, depressive disorder NEC, and anxiety state NOS." (R. at 12). As a result of limitations stemming from Plaintiff's migraine headaches, the ALJ determined that he was unable to engage in full-time work after April 20, 2011. (R. at 22 – 23). Prior to that time, however, Plaintiff was ineligible for disability benefits because the ALJ found that the medical record demonstrated that Plaintiff's impairments only limited him to light work of a simple, routine, repetitive nature, not performed in a fast paced production environment, with relatively few work place changes, and relatively low stress. (R. at 16 – 21). Based upon the testimony of the vocational expert, even with such limitations, Plaintiff was capable of engaging in work existing in significant numbers in the national economy. (R. at 22). Additionally, despite an inability to engage in full-time work after April 20, 2011, Plaintiff was found ineligible for DIB or SSI because the medical record did not demonstrate that Plaintiff's condition was likely to remain for a continuous twelve (12) month period as required under the Act. (R. at 22 – 23).

Plaintiff objects to these determinations by the ALJ, arguing that he erred in failing to find Plaintiff disabled since the alleged onset date. Plaintiff argues that the record supports his subjective claims of totally disabling pain beginning at the alleged onset date, and that the ALJ arbitrarily picked a new onset date and concluded that Plaintiff's disability would not continue for at least twelve months thereafter in spite of the weight of medical evidence on record showing otherwise. (ECF No. 11 at 4 – 7).

Defendant counters by arguing that the ALJ was entitled to give Plaintiff's subjective complaints only partial credit in light of conflicts with the objective medical record and Plaintiff's own prior statements. Defendant also argues that the ALJ's decision to pick a different onset date, and his subsequent determination that Plaintiff's inability to work could not be expected to continue for twelve months beyond, was supported by substantial evidence from the notes of treating sources. (ECF No. 13 at 7 – 12).

When rendering a decision, an ALJ must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. *Cotter v. Harris*, 642 F. 2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). The ALJ need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status, but must provide sufficient discussion to allow the court to determine whether any rejection of potentially pertinent, relevant evidence was proper. *Johnson v. Comm'r of Soc. Sec.*, 529 F. 3d 198, 203 – 04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F. 3d 112, 121 (3d Cir. 2000); *Cotter*, 642 F. 2d at 706). In the present case, the ALJ failed in this respect, frequently ignoring or misstating significant portions of the medical record to support his decision. Following a thorough review of the record evidence and the ALJ's rationale, the Court finds that Plaintiff has been disabled since June 25, 2010.

a. **The ALJ's finding that Plaintiff's course of medical treatment and use of medication "were not consistent with disabling impairments" was contrary to the evidence.**

The inaccurate recitation of the medical record by the ALJ obscured the reality of Plaintiff's steady, debilitating decline in health. Despite the ALJ's assertion to the contrary, Plaintiff's treatment history was totally consistent with that of an individual suffering from disabling migraine headache pain. Plaintiff initially sought treatment for migraine headaches in

March 2010 with Abdul Khan, M.D., his internal medicine/primary care physician. Nurse Practitioner Hromanik, of Dr. Khan's practice, also thereafter maintained a treatment relationship with Plaintiff, and her relevant findings were entitled to consideration. (R. at 298). *See* 20 C.F.R. §§ 404.1513, 416.913; S.S.R. 06-03p ("Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence on file").

Following two inpatient hospitalizations, Dr. Kahn completed a medical questionnaire for the Pennsylvania Bureau of Disability Determination on April 24, 2010, and stated that Plaintiff's prognosis was fair and that he had no physical limitations. (R. at 190 – 94). As a result of the continued deterioration of Plaintiff's condition, Nurse Practitioner Hromanik indicated in a June 25, 2010 assessment that Plaintiff was not able to work due to chronic headache pain, and Dr. Khan signed off on the assessment. (R. at 298). A similar assessment of inability to work – completed by Hromanik – was again issued by Dr. Khan's office in December 2010. (R. at 240). While Dr. Khan did not himself complete these assessments, the affixation of his signature to the June 2010 assessment is certainly positive evidence of his endorsement, and is due great emphasis. *McClinsey v. Astrue*, 2008 WL 5334725 at *10 n. 21 (citing *Altman v. Comm'r of Soc. Sec.*, 124 Fed. App'x 748 (3d Cir. 2005)). Dr. Khan thereafter completed an assessment of disability on June 20, 2011. (R. at 303 – 05). This is unequivocal evidence of a longitudinal history of significant limitation, bolstered by a serious treatment history.

The ALJ failed to acknowledge many facts from the record, including that Plaintiff was consistently treated by medical professionals at Dr. Khan's offices. (R. at 198, 236 – 40, 283 –

11

86, 291 – 99). Plaintiff also had numerous emergency room visits and hospitalizations for chronic headache pain. (R. at 197 – 99, 232 – 33, 241 – 43, 247 – 49, 273). His symptoms during these visits included nausea, vomiting, malaise, fatigue, sleep disturbance, and fainting. (R. at 241, 247). Plaintiff was attended to by numerous specialists when in the hospital, and was referred to specialists by Dr. Khan. (R. at 198 – 99). The specialists included neurologist Neil Busis, M.D., neurologist and pain medicine specialist Cheryl Bernstein, M.D., pain medicine and anesthesiology specialist Manijeh Ryan, M.D., neurologist Seth Lichtenstein, M.D., neurologist Jimmy Ong, M.D., neurologist J. Stephen Shymansky, M.D., neurologist and headache specialist Robert Kaniecki, M.D., pain medicine specialist Zongfu Chen, M.D, orthopedic physician Robert Liss, M.D., and orthopedic physician David Neuschwander, M.D. (R. at 186, 199, 201, 203 – 05, 247 – 49, 257 – 58, 273, 283 – 86, 295 – 99, 308 – 15). Of particular note, there is no evidence that Plaintiff was "doctor shopping," and none of these treating medical sources questioned the truthfulness of Plaintiff's claims.

In fact, the numerous diagnostic medical procedures and extensive medication regimens prescribed to Plaintiff in an attempt to alleviate his pain weigh heavily against the idea that he was not suffering to a significant degree, or that his complaints were not taken seriously. Diagnostic procedures included blood tests, urine toxicology screening, lumbar puncture, MRI scans, CT scans, and a sleep study. (R. at 197 – 99, 249, 282, 285 – 86). Medications prescribed included Norvasc, Tramadol, Atenolol, Ambien, Celebrex, Neurontin, Topamax, Tylenol, Motrin, Reglan, Oxycodone, Ultram, Diovan, Toradol, Morphine, Demerol, and steroids and analgesic cream. (R. at 197 – 99, 242, 257 – 58, 302). Plaintiff engaged in treatment at pain management clinics, and attended consults with pain specialists and neurologists. (R. at 232 – 33, 239, 243, 247 – 49, 257 – 58, 273, 302, 314 – 15). Alternative treatment modalities were

also suggested, such as nerve blocks, exercise, nutritional supplements, relaxation techniques, acupuncture, and chiropractic care. (R. at 198, 312 – 13). While many of the diagnostic tests provided little evidence of the etiology of Plaintiff's pain, none of the treating medical sources opined that a cause did not exist or that Plaintiff's complaints of pain constituted malingering. The consistent attempts by treating medical sources to determine the nature of Plaintiff's impairments, and the lengths medical sources went to provide Plaintiff with relief, militates against finding that Plaintiff's limitations were so minor that he could continue working. Moreover, this certainly is not evidence of a lack of credibility.

   b. **Contrary to the finding of the ALJ that Plaintiff had not used "an alternative treatment modality," the record clearly established that he did pursue alternative treatment.**

The ALJ found that Plaintiff never sought an "alternative treatment modality, such as referral to a pain clinic, biofeedback or a TENS unit." (R. at 19). The record is clearly to the contrary. First, Dr. Khan and his practice repeatedly referred Plaintiff to specialists for examination, evaluation, and suggestion of other treatment approaches. These specialists included numerous neurologists, orthopedic physicians, pain medicine specialists, and an ophthalmologist. (R. at 186, 199, 201, 203 – 05, 247 – 49, 257 – 58, 273, 283 – 86, 295 – 99, 308 – 15). Second, Dr. Khan referred Plaintiff to Dr. Kaniecki at the UPMC Headache Center. Plaintiff was seen by Dr. Kaniecki in May 2011, just one month before the decision of the ALJ. Dr. Kaniecki recommended a change in medications and alternative treatment such a nutritional supplements, acupuncture, chiropractic care, and relaxation techniques. Contrary to the ALJ's finding, Dr. Kaniecki also expressly recommended biofeedback. (R. at 313). Thus, the ALJ's assertion that Plaintiff had not explored alternative treatments is contrary to the record.

**c. Contrary to the finding of the ALJ that Plaintiff had not used a "referral to a pain clinic," the record clearly established that Plaintiff was referred to, and treated at, a pain clinic.**

The ALJ found that Plaintiff never sought treatment through referral to a pain clinic. (R. at 19). This statement is contrary to the record. Dr. Khan referred Plaintiff to the UPMC Pain Medicine Clinic on a number of occasions throughout his care. Upon discharge from the hospital on March 22, 2010, Plaintiff was referred to the "pain clinic" at UPMC. (R. at 233). Plaintiff was diagnosed with chronic headache and myofascial pain, and was treated at the UPMC Pain Medicine Clinic on an outpatient basis in April 2010 and June 2010. (R. at 257, 302).

In addition, while Plaintiff was hospitalized at UPMC Shadyside from December 9, 2010 through December 13, 2010, the UPMC Chronic Pain Service was involved in his care. (R. at 257 – 58). In fact, the UPMC Chronic Pain Service was managing Plaintiff's pain medication. (R. at 245). Moreover, as mentioned above, Plaintiff was also treated at the UPMC Headache Center in May 2011 and was directed to return in July 2011[5]. Again, the ALJ's finding that Plaintiff had not used a pain clinic for treatment was contrary to the record.

**d. The ALJ's reliance on Dr. Kaniecki's two sentence letter to find that Plaintiff was not disabled was contrary to the record.**

Plaintiff was referred by Dr. Khan, his treating physician, to Dr. Kaniecki at the UPMC Headache Center for a consultation. Plaintiff had to wait several months for an appointment. (R. at 285, 293). Plaintiff was finally seen by Dr. Kaniecki on May 12, 2011. (R. at 308 – 13). Dr. Kaniecki diagnosed Plaintiff with chronic migraine without aura, with intractable migraine, depressive disorder, anxiety, and insomnia. (R. at 311). Dr. Kaniecki adjusted Plaintiff's medications, made lifestyle recommendations, and suggested alternative treatment modalities

---

[5] The ALJ's decision was dated June 23, 2011. (R. at 23).

such as specific nutritional supplements, biofeedback, relaxation techniques, acupuncture, and chiropractic care. (R. at 312 – 13). Dr. Kaniecki directed that Plaintiff "return in about two months (around 07/12/2011)." (R. at 311).

On June 23, 2011, just over a month later, the ALJ issued his decision. (R. at 23). In the discussion, the ALJ found that Plaintiff was unable to work since April 20, 2011.[6] (R. at 22). However, the ALJ then found that Plaintiff's "impairments fails [sic] to meet the 12-month duration test because the medical record indicates that the claimant's condition is expected to improve within 12 months with an adjustment in his treatment." (R. at 23). Therefore, the ALJ concluded that Plaintiff was not disabled since April 20, 2011. (R. at 23).

The ALJ solely relied on Dr. Kaniecki's two sentence letter, addressed "to whom it may concern," in which Dr. Kaniecki stated that Plaintiff was disabled as of the day of the initial consultation on May 21, 2011, and that "we expect him to be temporarily disabled as we adjust his treatment program." (R. at 308).

This single sentence upon which the ALJ relied is hardly evidence that Plaintiff's disability had not lasted twelve months, and would not last twelve months into the future. Dr. Kaniecki merely stated an undefined expectation or hope based upon a single consultation. Dr. Kaniecki did not define "temporary." He provided no opinion whatsoever as to how long the disability would continue or when Plaintiff would no longer be disabled. Dr. Kaniecki did not complete any disability questionnaire or any other document opining as to the duration of the disability. *See Plummer v. Apfel*, 186 F. 3d 422, 430 (3d Cir. 1999) (citing *Jones v. Sullivan*, 954 F. 2d 125, 129 (3d Cir. 1991)) (a medical opinion is not entitled to any weight if unsupported by objective evidence).

---

[6] No specific rationale was provided by the ALJ for the selection of this date, nor was there a specific medical event or diagnosis related to this date in the record.

15

This Court finds that there is no substantive evidence in the record that Plaintiff's disability would not last twelve months into the future. There is no evidence in the record that Dr. Kaniecki's adjustment of the treatment program would resolve Plaintiff's severe migraine headaches within twelve months. Accordingly, the ALJ's reliance on the nonspecific sentence in the Kaniecki letter to find that Plaintiff fails to meet the twelve month durational test is not supported by the record. In the event that Dr. Kaniecki's prescribed treatment and the ongoing care by Dr. Khan eventually resolve the chronic migraine headaches suffered by Plaintiff, then Plaintiff's disability status can be addressed at that time.

  e. **The ALJ failed to recognize the full record of Plaintiff's recent earnings.**

The ALJ sought to diminish the credibility of Plaintiff's disability claims by stating that his "earning history is unimpressive." (R. at 19). This Court's review of the record reveals that the ALJ failed to include Plaintiff's recent two highest-earning years in his list of Plaintiff's former income, in his ruling. (R. at 19). In 2006, Plaintiff earned $10,630.13, and in 2007, Plaintiff earned $27,381.15. (R. at 116). These are significant omissions of fact by the ALJ, and undermine any argument that substantial evidence supported his decision. The ALJ cannot reject probative evidence for "no reason or for the wrong reason." *Morales v. Apfel*, 255 F. 3d 310, 317 (3d Cir. 2000) (citing *Mason v. Shalala*, 994 F. 2d 1058, 1066 (3d Cir. 1993)). Ignoring probative evidence is not an acceptable basis for a disability determination. *Burnett*, 220 F. 3d at 121.

  f. **Consideration of remand.**

The only remaining issue is whether the case should be remanded to the Commissioner or reversed with a direction to award benefits to Plaintiff. *Morales v. Apfel*, 225 F. 3d 310, 320 (3 Cir. 2000). "[T]he decision to . . . award benefits should be made only when the administrative

record has been fully developed and when substantial evidence in the record as a whole indicates that the claimant is disabled and entitled to benefits." *Id.* (quoting *Podedworny v. Harris*, 745 F. 2d 210, 222 (3d Cir. 1984)). It is clear from the evidence that Plaintiff's disabling pain began in 2010, and that the medical record showed that his treating sources felt he was unable to work as of June 25, 2010. Remand, therefore, is unnecessary.

**C. CONCLUSION**

Based upon the foregoing, substantial evidence supported Plaintiff's disability under the Act. Accordingly, it is respectfully recommended that Plaintiff's Motion for Summary Judgment be granted, Defendant's Motion for Summary Judgment be denied, and the decision of the ALJ be reversed, and the Commissioner be ordered to make an immediate award of benefits to Plaintiff beginning June 25, 2010.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1), and Local Rule 72.D.2, the parties are permitted to file written objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to timely file objections will waive the right to appeal. Brightwell v. Lehman, 637 F.3d 187, 193 n. 7 (3d Cir. 2011). Any party opposing objections may file their response to the objections within fourteen (14) days thereafter in accordance with Local Civil Rule 72.D.2.

Respectfully submitted,

*s/ Maureen P. Kelly*
Maureen P. Kelly
United States Magistrate Judge

Dated: February 14, 2013

cc: All counsel of record via CM/ECF